# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT DOUGLAS DUNN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-cv-01079** |
| | ) | **Judge Aleta A. Trauger** |
| **AUTOMOTIVE FINANCE CORPORATION,** | ) | |
| **KAR AUCTION SERVICES, INC., AND** | ) | |
| **ADESA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The defendants have filed a Motion for Summary Judgment (Docket No. 35), to which the plaintiff, Robert Dunn, filed a Response in opposition (Docket No. 49), and with respect to which the defendants filed a Reply (Docket No. 52), Dunn filed a Sur-Reply (Docket No. 58), and the defendants filed a Rebuttal to the Sur-Reply (Docket No. 61). For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted in part and denied in part.

## BACKGROUND

### I. OVERVIEW

In late September 2010, Robert Dunn attended a training session held by his (now) former employer, the Automotive Finance Corporation ("AFC"). On October 8, 2010, approximately one week after that training session concluded, AFC terminated Dunn for comments he allegedly made at one or more informal gatherings that took place after each day of training. Dunn claims that the comments included activity protected by Title VII of Civil Rights Act of 1964 (and by extension the Tennessee Human Rights Act ("THRA")), and that, by terminating him, AFC,

1

KAR Auction Services, Inc. ("KAR"), and ADESA, Inc. ("ADESA"), improperly retaliated

against him for making those protected comments. Dunn also asserts a breach of contract claim,

contending that, but for his unlawful termination, he would have received a performance bonus in

early 2011. For purposes of summary judgment only, the defendants do not contest that the court

should treat them as joint employers.[1]

## II.   MATERIALS CONSIDERED

The parties have filed a substantial volume of evidentiary materials regarding the

defendants' Motion for Summary Judgment. In support of the defendants' Motion for Summary

Judgment, the defendants have filed, *inter alia*, the Declaration of Jeffrey Barber (Docket No. 39)

(ADESA Senior Vice President, Human Resources Administration), the Declaration of Michelle

Daidone (Docket No. 40) (AFC Human Resources Manager) (attaching Employee Handbook,

Personal and Professional Conduct policy, and Dunn's termination letter), the Declaration of

Frank King (Docket No. 53) (AFC Memphis Branch Manager), and the Declaration of Chad

Stangland (Docket No. 54), along with various deposition transcript excerpts (*see* Docket Nos. 38

and 55), and certain materials related to the disposition of Dunn's administrative charge to the

Equal Opportunity Employment Commission ("EEOC"). In support of his opposition to the

Motion for Summary Judgment, Dunn has filed, *inter alia*, an affidavit on his own behalf (Docket

---

[1]Dunn's Complaint, which was originally filed in Tennessee state court, also asserted claims for race discrimination under Title VII and the THRA, as well as a whistleblower claim under the Tennessee Public Protection Act. (*See* Docket No. 1, Ex. 2.) After the defendants removed the case to this court, Dunn filed an Amended Complaint that incorporated the original Complaint by reference and added additional paragraphs alleging that the defendants should be held jointly liable to Dunn. (*See* Docket No. 10.) Following discovery, Dunn stipulated to the dismissal of all claims other than (1) retaliation claims against all defendants under Title VII and the THRA; and (2) the breach of contract claim against all defendants under Tennessee common law. (Docket No. 34.)

No. 44, Ex. 1), notes taken by Daidone during her investigation of Dunn's comments (Docket No. 44, Ex. 15), the defendants' discovery responses (*id.*, Ex. 4), and various deposition excerpts (*see* Docket No. 44).

Citing to the evidentiary materials, the parties have filed statements of material fact and corresponding responses thereto (*see* Docket Nos. 37 (Defs. SMF) and 46 (Pltf. Resp. To Defs' SMF), and 47 (Pltf. SMF) and 55 (Defs. Resp. to Pltf. SMF)). The court generally takes issue with the plaintiffs' Responses to the defendants' Statement of Material Facts, in which the plaintiffs introduce pages upon pages of information in response to particular facts, often in a "cut and paste" manner that results in redundant and unnecessary paragraphs. This disfavored practice, which does not honor the letter or spirit of Local Rule 56.01(c), has unnecessarily forced the court to expend extra resources to distill the facts to determine which are "admitted," which are "denied," and which are subject to a genuine dispute – as well as to determine which information cited by Dunn is irrelevant and/or non-responsive.

Notwithstanding these difficulties, the court has analyzed the materials in the record to identify and distinguish the disputed and undisputed facts of the case. As it must at the summary judgment stage, the court views all the facts in the light most favorable to Dunn and draws all reasonable inferences in his favor.

III.    **FACTS RELATING TO RETALIATION CLAIMS**[2]

A.    **September 2010 Incidents**

In late September 2010, Dunn and other AFC management employees from across the

_____

[2]The court will address facts relating to the breach of contract claim, which are distinct from the facts relating to the retaliation claims, in a separate section.

3

country participated in a four-day training session in Indianapolis.  After each day of training, Dunn and certain Branch Managers and Assistant Branch Managers from other offices went to dinner and/or had drinks together.  At two of these post-training social events, Dunn made comments that precipitated his termination.  With respect to both incidents, several white Branch Managers ("BMs") – Bill Engle, Chad Stangland, Christina ("Chris") White, Jean Warzynski, and Dunn – and one black Assistant Branch Manager ("ABM"), Rick Hopkins, were present.[3]

In the first incident, the BMs and ABM discussed the fact that Michael Vick had been allowed to return to play professional football after committing crimes, whereas Tiger Woods had been severely criticized and/or disciplined for engaging in extra-marital activity.  Dunn stated that he had heard a sports commentator speculate that this differential treatment might be attributable to the fact that Woods played in a predominantly white sport and, therefore, that he had been held to a different standard of personal conduct.[4]

In the second incident, while the BMs and ABM Hopkins were having post-dinner drinks a day or two later , BM Engle pointed to Hopkins and said something to the effect of, "Here is our next black Branch Manager."[5]  Dunn claims that he had heard Engle make racially insensitive

---

[3]At deposition, some of the witnesses suggested that there may have been additional participants, although contemporaneous records indicate that only these six individuals were present at both gatherings.

[4]Some of the other participants in the meeting recalled Dunn making a more racially charged statement, to the effect that Tiger Woods was being held to "white man's standard" of conduct with regard to marital fidelity.  However, the court adopts Dunn's version of his statement, which is more favorable to his position.

[5]Although several sources in the record indicate that Engle said "Here is our next branch manager" or "This is our next branch manager," Dunn testified at deposition that he heard Engle say "This is our next *black* branch manager."  (Docket No. 45, Ex. 1, Dunn Dep. at 48:1-4 (emphasis added)).  Construing the facts in the light most favorable to Dunn, the court adopts Dunn's characterization of Engle's statement.

remarks in the past. Believing that Engle was mocking Hopkins, Dunn told Hopkins, in front of everyone present, "Good luck. Have you seen a family photo of this place?"[6] Dunn also may have stated that AFC had few black managers and/or that there were few African-American managers "walking the halls" at AFC.

### B. Warzynski's Complaint and the Ensuing Investigation

On October 5, 2010, Ms. Warzynski, one of the witnesses to these incidents, complained to Daidone in the Human Resources Department that Dunn had acted inappropriately at the post-training social events.[7] In response to that complaint, Daidone interviewed Warzynski on the telephone and took contemporaneous notes of the interview. According to those notes, Warzynski reported that Dunn had stated that, *inter alia*, "AFC is racist," "Rick Hopkins (African American) didn't have a chance w/company because it is racist," and "AFC wants 'old white guys.'" According to the notes, Warzynski also reported that Dunn had "made jokes about being part Cherokee Indian and whites can't live with them – can't remember punch line," stated that he intended to work "until 12/31/10 to get his bonus check and then he is going to leave," "made comments about Tiger Woods action['s] were deemed ok publicly because he was held to a black man's standard," "made comments about being south of the Mason-Dixon line," and stated that if one of Dunn's clients didn't understand English, he "has them sign [the contract] anyway." The

---

[6]At deposition, Dunn stated that he made this exact statement. In an affidavit filed in support of his Response here, Dunn now claims that he stated "I would hope so but, You know we only have one black manager. Have you seen a group photo of this company. Good luck." (Dunn Aff. ¶ 11.) The affidavit version is a materially different statement than the one Dunn recalled at deposition. Because Dunn's affidavit is inconsistent with his deposition testimony, the court will only consider Dunn's deposition testimony on this point.

[7]During the relevant time frame, Ms. Daidone is referred to by multiple surnames. For purposes of simplicity, the court will refer to her by her current last name, "Daidone."

5

notes indicate that Dunn's comments "made everyone uncomfortable." The notes also indicate that, according to Warzynski, she, Engle, and Stangland told Dunn "it was enough" and that "it was inappropriate conversation," to which Dunn had responded "that's just how I am, because I'm a country boy."

After interviewing Warzynski, Daidone also spoke with Stangland, Engle, White, Hopkins, and Dunn. Daidone took contemporaneous notes of these interviews,[8] which reflect the following information:

- Chad Stangland: The notes indicate that Stangland could not recall many specific details about the incident, other than the fact that Dunn had made "off color, racial remarks" that were "inappropriate, but nothing too offensive." Stangland recalled Dunn commenting that he (Dunn) was "not white, he's Indian," that Dunn was "not happy with company" and was "here for short-term and something about here for bonus," and that Dunn had stated "something about all the branch managers are white." In a declaration filed in support of the defendants' Motion for Summary Judgment here, Stangland avers that the notes accurately reflect the

_____

[8]Dunn argues that Hopkins' deposition testimony establishes that Daidone did not actually interview Hopkins on October 6, 2010, as Daidone's interview notes indicate. Dunn's position relies on selectively quoting from Hopkins' testimony. When questioned by Dunn's counsel at deposition, Hopkins initially stated that Daidone questioned him about the incident "at least a year or more" after it occurred, then stated that it "definitely" happened at least two weeks after the incident, then stated that it was "[m]ore than a couple of months, if I had to guess." However, Hopkins repeatedly stated in his deposition that "a lot of time had elapsed" and that he was having trouble remembering the timing and substance of the incidents and the follow-up investigation. (*See, e.g.*, Hopkins Dep. 67:1-6 ("I mean, again, I don't know exactly how long, you know, how long it went by . . . . I'm not good with time. Let's put it that way.")) When defendants' counsel questioned Hopkins later in the deposition, Hopkins testified that he "very definitely" could have given the wrong time frame as to when Daidone interviewed him, and he "couldn't give an exact time. I mean, it could be later or shorter." (*Id*. at 84:2-20.)

Neither side presented Hopkins the interview notes to refresh his recollection regarding whether he actually spoke to Daidone on October 6, 2010. Given Hopkins' equivocations and disclaimers at deposition, the Hopkins deposition excerpt cited by the plaintiff here does not, standing alone, create a genuine issue of fact as to whether Hopkins was actually interviewed on October 6, 2010.

substance of his report to Daidone.[9]

- Bill Engle: Daidone interviewed Bill Engle twice. According to Daidone's notes concerning the first interview, on October 5, 2010, Engle could recall very little about the incidents, other than "Tiger [Woods] was being judged by white man's standards or something like that," which Engle construed as an "off color" comment. On October 6, 2010, Daidone had a follow-up discussion with Engle (it is unclear from the record who initiated it), in which he stated that there were "some other things that were said, that he [Engle] felt were inappropriate," that Dunn said "something to the affect [sic] that there were not many blacks working for the company." Engle conveyed that Dunn's comments "were not appropriate for today's standards" and that a "black minority was the target of the comments."

- Chris White: According to Daidone's notes, Chris White reported that Dunn had stated that "AFC doesn't hire a lot of black manager[s]," that Dunn's mother was "Indian" and "wasn't allowed to sit with white people back in the day," and "something about Tiger Woods has to be held to white man's standard." She reported that the comments made "everyone else feel bad," that "they all said you [Dunn] need a filter, you need to stop," and that it made the training week end "on a sour note."

- Rick Hopkins: According to Daidone's notes, Hopkins reported that Dunn had stated that he "can't wait until Feb to get his bonus and leave," that "AFC is a racist company" with "no Native Americans working at corporate", that Hopkins "is just ABM doesn't matter, you won't make it in company because he's African American," and that "Tiger Woods is being held to a white man's standards [sic] that's why he's getting so much heat." Dunn had also "asked Rick if he saw any African-Americans walking the halls." According to Hopkins, the whole episode was "disturbing" and "strange," and that it made him and everyone else present feel uncomfortable. He also expressed that "Robert [Dunn] was doing a good job on his own making himself look silly," and that "everyone was blown away [and] surprised."

---

[9]At deposition, Stangland had provided testimony arguably inconsistent with the substance of Daidone's notes. However, defense counsel did not show Stangland the notes before his deposition and, at deposition, plaintiff's counsel did not show Stangland the notes to refresh his recollection and/or to probe whether they accurately reflected his report to Daidone. In his affidavit filed in this case, Stangland avers that he reviewed Daidone's notes after his deposition, that they refreshed his recollection as to what he told Daidone, and that Daidone's notes accurately summarized his report to her.

7

## C.    Dunn's Interview with Daidone and Keadle

On October 8, 2010, after interviewing the other participants, Daidone and Joe Keadle (Dunn's regional manager) interviewed Dunn.  Both Daidone and Keadle took contemporaneous notes of this meeting.

According to Keadle's notes, Dunn denied using racial slurs, but (a) admitted to stating that Hopkins would "not go far b/c African American," (b) made "Comments RE diversity," and (c) stated that "ABM [Assistant Branch Manager] would not be a BM because he was black, only one Black BM [Branch Manager] in group."  Dunn also denied being racist, stated he had "no ill will toward company [*i.e.*, AFC]," and denied having discussed his bonus at the events.  Keadle's notes also indicate that Dunn stated that "everyone was drinking at the party 3-4 beers over the evening," he "thought it was a friendly crowd," and he had a "dry sense of humor."  At his deposition in this case, Keadle also clarified that, at the time, he understood that Dunn had told Hopkins that he would not be promoted because Dunn didn't believe that AFC promotes minorities.  (*Id.* at 66:2-5.)  Keadle testified – over an objection from his counsel – that Dunn was fired in part for stating that AFC was a racist company.  (*Id.* at 75:17-76:2.)  Keadle also stated that "it [s]eems to me like Mr. Dunn was being racist by putting all these doubts in this employee's [Hopkins'] head."  (*Id.* at 66:11-12.)

Daidone's notes are in many respects consistent with Keadle's, except that they include more references to Dunn making defensive statements.  For example, the notes indicate that Dunn protested that his comments were "not derogatory," that he "did not have ill feelings toward the company" and "would not put the company down," that he "looks out for company image and cares about it," and that he didn't believe he had said or done anything wrong.  The

8

notes contain several references to the Tiger Woods comment, which Dunn admitted that he made.

At deposition, Dunn described certain additional details concerning his interview with Daidone and Keadle. Dunn said he was asked "Do you think we are a racist company?", to which he said "no," because "I do not know Ms. [Daidone] and I do not know all of the people that work there, so I replied no." Dunn did not tell Daidone and Keadle about the "family photo" comment, but instead told them that he had merely told Hopkins "good luck." Also, when Daidone asked him, "Did you tell the African-American assistant manager that he would never be a branch manager?," Dunn replied "no."

### D.  Dunn's Termination

Although it appears nowhere else in the record, at deposition Keadle testified that someone, likely Daidone, also told him that Dunn had used the "N" word in the incidents in question. (*See* Docket No. 44, Ex. 3, Keadle Dep. at 57:2-4 ("So Ms. [Daidone] then told you that Mr. Dunn had used the N word? A: Uh-huh.")) Keadle stated that Dunn's purported use of the "N" word played a role in Keadle's decision to recommend Dunn's termination. (*Id.* 57:12-17.)

Following the interview with Dunn, Keadle and Daidone met with Jeffrey Barber, ADESA's Senior Vice President. According to the defendants, Barber, Keadle, and Daidone agreed that Dunn's denials were not credible and were incompatible with the largely consistent accounts provided by all of the other (disinterested) witnesses. Based on the available information, they concluded that Dunn had violated the company's Personal and Professional Conduct Policy and that his conduct warranted termination. That policy defined "misbehavior

9

and misconduct" to include any conduct that involves "inappropriate words or gestures which offend others," "acts of disrespectful or unprofessional conduct," "insults or ridicule," or "intimidation." The policy also required employees to "make sure acts and words are clear and free of discourtesy" and to "[r]espect the rights of fellow employees, associates, and customers, and make no broad assumptions or public judgments about individual or group conduct or values." (*See generally* Docket No. 40, Daidone Decl., Exs. A1 (Employee Handbook at Section IV, Part 4.0) and B.)

Barber spoke with AFC's President Don Gottwald and with AFC's Chief Operating Officer John Hammer, who concurred that Dunn should be terminated. On October 8, 2010, Keadle informed Dunn that he was terminated. Later that day, Daidone sent Dunn a letter confirming Dunn's termination on the grounds that, "following an investigation, the Company has deemed you to be in violation of its Professional and Personal Conduct policy []." (*See* Daidone Decl., Ex. B.)

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is

10

an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

## I.    OVERVIEW OF RETALIATION CLAIMS

The defendants argue that Dunn's retaliation claims should be dismissed on either of two

11

grounds. First, they argue that Dunn did not engage in activity that Title VII and the THRA protect and that, therefore, he cannot establish an element of his *prima facie* case. Second, they argue that, even assuming *arguendo* that Dunn in fact engaged in some form of protected activity, Dunn cannot show that the defendants' grounds for terminating him constituted a pretext to terminate Dunn for engaging in protected activity.[10]

## II. PROTECTED ACTIVITY

The parties agree that Dunn's Title VII and THRA claims are governed by the traditional *McDonnell Douglas* burden-shifting framework and, for purposes of liability, by the same legal standards, namely those that apply to Title VII claims. *See Johnson v. Metro. Gov't of Nashville & Davidson Cnty. Tenn.*, 502 F. App'x 523, 542-543 (6th Cir. Oct. 18, 2012) (citing *Bobo v. UPS*, 665 F.3d 741, 757 (6th Cir. 2012)) (stating that, in Tenn. Code Ann. § 4-21-311, Tennessee codified the *McDonnell Douglas* framework with respect to THRA claims); *accord Pigott v. Battle Ground Acad.*, — F. Supp. 2d — , 2012 WL 5565241, at *12 (M.D. Tenn. 2012). Under that framework, Dunn must establish a *prima facie* case of retaliation by showing that (1) he engaged in "protected activity"; (2) his employer knew that he engaged in protected activity; (3) he was subjected to an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010). Once this showing is made, the defendants must articulate a legitimate nonretaliatory reason for its action before the burden shifts

---

[10]As explained herein, this court must also consider whether the Supreme Court's intervening decision in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — S. Ct. —, 2013 WL 3155234 (Jun. 24, 2013), which the Court issued after the parties completed briefing the Motion for Summary Judgment, impacts the disposition of this case at summary judgment.

12

back to Dunn to show that the proffered reason was not their true reason but merely a pretext for retaliation. *Id.* The burden of persuasion remains with Dunn throughout. *Id.*

The defendants argue that Dunn cannot establish a *prima facie* case of retaliation because Dunn did not engage in "protected activity." Under Title VII, "protected activity" includes either (a) participation in any proceeding under Title VII (the "participation clause") or (b) opposition to a practice declared discriminatory under Title VII (the "opposition clause"). *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 581 (6th Cir. 2000); *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 275, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009). Here, Dunn argues that he engaged in activity subject to the opposition clause.

Under the opposition clause, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII. *Id.* at 579-80. Title VII does not define the term "oppose". Therefore, the Supreme Court has stated that the term carries its ordinary meaning, which is "to resist or antagonize . . . ; to contend against, to confront; to resist; withstand." *Crawford*, 555 U.S. at 276 (ellipsis in original) (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1958)). The term "opposition" includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer – *e.g.*, former employers, union, and co-workers." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008); *Johnson*, 215 F.3d at 579-80 (citing *EEOC Compliance Manual*, (CCH) ¶ 8006)). However, "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of [the employee's] opposition must be

reasonable." *Niswander*, 529 F.3d at 721 (quoting *Johnson*, 215 F.3d at 580). The Supreme

Court has clarified that, "[w]hen an employee communicates to her employer a belief that the

employer has engaged in . . . a form of employment discrimination, that communication *virtually*

*always constitutes the employee's opposition to the activity*." *Id.* at 851 (emphasis added).

As an initial matter, the defendants argue that the court is precluded from evaluating

whether the defendants' contemporaneous findings (after the interviews and before Dunn's

termination) were actually correct. As explained in the next section, this principle is at least

applicable to the *pretext* inquiry, which, under the circumstances presented here, turns on what

information the interviewees related to the defendants about Dunn's conduct at the dinners,

whether or not those accounts were perfectly accurate. However, whether Dunn actually engaged

in protected activity does turn, at least in part, on what he actually said during the incidents in

question. If he did (arguably) engage in protected activity, the next question is whether, for

purposes of Dunn's *prima facie* case, the defendants became aware of the fact that Dunn had

engaged in protected activity.

Viewing the facts in the light most favorable to Dunn and drawing all reasonable

inferences in his favor, Dunn made one comment or a set of comments that could reasonably be

construed as protected activity: complaining in front of the Branch Managers that AFC

discriminated on the basis of race with regard to promoting black managers. There are

competing accounts as to precisely what Dunn said, although the witnesses who recall the

incident appear to agree that Dunn accused AFC of being a racist company and/or that Dunn

stated that AFC would not promote Hopkins because he is black. According to Dunn, he

personally believed at the time that AFC had a paucity of black managers nationwide and that

14

AFC had discriminated against blacks. He also had heard Engle make (unspecified) racially derogatory remarks in the past and believed that Engle was making fun of Hopkins when he introduced him as the "next black branch manager." Dunn, fed up with what he perceived to be discrimination by AFC, made a pointed comment at the dinner that Hopkins was unlikely to be promoted in the face of AFC's systematic discrimination. The fact that Dunn made this comment in front of a black Assistant Branch Manager and that it made the white employees "uncomfortable" was just a side effect of speaking his mind that the company had and would continue to practice illegal racial discrimination.

The defendants argue that Dunn is turning the definition of "protected activity" under Title VII on its head. They argue that Dunn made a number of racially insensitive remarks, including Dunn's allegation that Hopkins would not be promoted because he is black, and that Dunn now seeks to insulate himself from the consequences of this inappropriate conduct by concocting a *post hoc* rationalization that he had actually engaged in some form of "opposition" activity. The defendants argue that the substance of Dunn's post-incident interview with Daidone negates Dunn's contention that he had engaged in protected activity. During that interview, Dunn apparently denied that AFC is a racist company and did not disclose the entirety of his comment(s) accusing the company of racism, although, according to Keadle's notes, Dunn may have referenced the lack of black managers and its potential impact on Hopkins' ability to advance. In his briefing with respect to the Motion for Summary Judgment, Dunn does not appear to dispute that he withheld some information from Daidone and Keadle during his interview. Furthermore, at least based on the record before the court, Dunn has not explained why he was not entirely forthcoming during that interview.

If Dunn's interview were the only indication in the record that he had engaged in protected activity or that AFC construed his comments as protected activity, Dunn might not be able to establish a *prima facie* case. However, this case involves the peculiar circumstance that, despite Dunn's denials following the incident, the defendants found (at the time) that Dunn *did* accuse the company of systematic racial discrimination. The defendants also admit that Dunn's accusation that AFC is racist and only wants "old white guys" in management was a factor in its decision to terminate Dunn. (*See* Docket No. 44, Ex. 4, Defs. Resp. to Pltf. Interrogatory to No. 11.) The court does not find that Dunn's apparent reticence to admit to the potentially protected statements precludes a finding that Dunn engaged in protected activity. It could be that Dunn feared losing his job if he reiterated his accusation that the company discriminates against blacks; on the other hand, it could be that Dunn had subjectively realized that his statements at the dinner were not meant to "oppose" discrimination by AFC for purposes of Title VII. Resolution of the nature of Dunn's statements, which turns on disputed characterizations of the facts, is a matter for the jury to decide.

The defendants also argue that the manner in which Dunn raised his objections was too "vague" and/or not "reasonable," citing to several decisions by the Sixth Circuit and district courts within the Sixth Circuit. The court finds none of the cases cited to be controlling here. For example, when an employee fails to state that a company retaliated against an employee for engaging in conduct protected by Title VII, such as opposing race or gender discrimination, the employee is not engaged in protected activity. *See Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 530-531 (6th Cir. 2004) (following demotion, where demoted white employee made vague reference in letter that employer with predominantly black workforce should have interviewed

outgoing white employees "as a group, rather than one disgruntled employee at a time," employee had not engaged in protected activity because employee was merely "contesting the correctness of a decision made by his employer rather than asserting discrimination."); *Manstra v. Norfolk S. Corp.*, No. 3:10-CV-166, 2012 WL 1059950, at *9-*13 (E.D. Tenn. Mar. 28, 2012) (finding that female plaintiff's complaints about "harsh" and "condescending" conduct by male supervisors did not constitute protected activity, where plaintiff's complaint did not mention gender-based discrimination); *see also Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009) (employee did not engage in protected activity, where employee "did not take an overt stand against suspected illegal discriminatory action; [employee] did not even mention the term discrimination; it did not suggest the need for an investigation into discriminatory practices, and there is no evidence that [recipients of the report] understood [it] to be charging discrimination"). Similarly, if an employee simply accuses a particular supervisor of racial intolerance without stating that the *employer* engaged in an unlawful employment practice, the employee did not engage in protected activity. *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313-1314, 1314 n.4 (6th Cir. 1989) (complaints that a particular supervisor was racist related to whether "one of its employees has a racial intolerance," "not that [the employer] is engaging in unlawful employment practice.")

Here, viewing the facts in the light most favorable to Dunn, Dunn complained that AFC as a company discriminated against black employees, the accusation was harsh enough to make everyone who heard the comment uncomfortable, and AFC viewed Dunn as accusing the company (fairly or unfairly) of race-based discrimination with respect to the promotion of black managers company-wide. Based on the record, the court finds that a reasonable juror could

17

conclude that Dunn accused the company of engaging in conduct that violated Title VII and that, under the applicable legal standard, Dunn's conduct constituted activity protected by Title VII. Of course, a juror could also find that Dunn's comments did not constitute "opposition" to racial discrimination, particularly in light of his deposition testimony.[11]

Although this case involves circumstances that may be at the farthest margins of conduct protected by Title VII, the Supreme Court and the Sixth Circuit have interpreted the scope of protected activity broadly, subject to exceptions not present here. Therefore, Dunn has established at least a question of fact concerning his *prima facie* case, sufficient to shift the burden to the defendants to articulate non-discriminatory grounds for Dunn's discharge.

## III.    CAUSATION AND PRETEXT

Here, the defendants argue that they had legitimate non-discriminatory reasons for terminating Dunn: namely, that Dunn engaged in inappropriate, unprofessional, and demeaning conduct, including racially derogatory conduct directed towards a black employee. The

---

[11]The defendants rely heavily on the fact that, at deposition, Dunn stated, at the end of answering a question, that he "did nothing to oppose" discrimination by AFC. As Dunn points out in his briefing, Dunn's complete response is more nuanced: at deposition, Dunn testified that he made the accusation to let Hopkins be aware of "what he had ahead of him," then testified that he "didn't do anything to oppose" AFC's allegedly discriminatory practices. (*See* Docket No. 44, Ex. 2, Dunn. Dep. 53:20-54:12.) After this exchange, counsel for the defendants did not ask any follow-up questions on this issue. Although it is a close question, the court is persuaded that Dunn's statement, while likely damaging to his case with respect to pretext, could reasonably be construed as (1) equivocal (2) reflecting a lack of understanding of the legal definition of "oppose," as construed by the Supreme Court and the Sixth Circuit, and (3) not reflecting a legal disavowal of having engaged in protected activity, particularly in light of other testimony from Dunn establishing that he actually intended to convey that AFC was a racist company. (*See, e.g.*, *id.* at 47:2-4 ("I meant by that that AFC apparently did not hire that many African-Americans as branch managers, they had only one.") and 54:5-8 ("I feel as though AFC does not hire people that are African-American based on the color of their skin, that is what I'm talking about.").)

18

defendants' interrogatory responses indicate that, *inter alia*, the defendants terminated Dunn for making the following "racial and derogatory remarks": (1) denigrating Hopkins because he was just an Assistant Branch Manager and would never make it in the company, given that "there were no African-Americans walking the halls," (2) the "Automotive Finance Company is a racist company and only wants 'old white guys'"; (3) stating that Tiger Woods was being held to a "white man's standard" and not the standard applied to other black athletes because of the sport he plays; (4) observing that he (Dunn) was "south of the Mason-Dixon line"; (5) stating that he only planned to work until December 31 to get his bonus check, at which point he planned to leave the company; and (6) stating that, if a customer could understand English, he would have those customers sign contracts anyway.[12]  AFC also found, at the time, that all of the meeting participants, including Hopkins, agreed that Dunn had acted "out of line" or "inappropriately" at the social functions at issue.  AFC argues that Dunn's conduct violated its existing Personal and Professional Conduct Policy, which broadly required employees (a) not to engage in disrespectful, discourteous, or unprofessional conduct, including insults or ridicule of co-workers, and (b) to refrain from making "broad assumptions or public judgments about individual or group conduct or values."  (*See* Employee Handbook at Section IV, Part 4.0).)

To show pretext, a plaintiff must show that an employer did not "honestly believe" in the proffered non-retaliatory reason for its adverse employment action.  *See Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001); *Larocque v. City of Eastpointe*, 245 F. App'x 531, 537 (6th Cir. 2007) (Title VII retaliation claim); *Niswander*, 539 F.3d at 728-29; *Sullivan v. River*

---

[12]In point of fact, statement (5) is not a "racial remark," although it could have been construed by AFC as inappropriate for other reasons.

*Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999) ("The honest belief standard is appropriate in considering pretext where an employer's intention matters . . . .")  In determining whether a defendant had an "honest belief" in the proffered basis for the adverse employment action, the court looks to whether the employer can establish its reasonable reliance on the particularized facts that were before it at the time.  *Id.* at 494.  "In deciding whether an employer reasonably relied on the particularized facts then before it, the court is not required to find that the decisional process used by the employer is optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Id.* (quoting *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998)).  Under this approach, the court is precluded from inquiring as to whether the employer's decision was correct or optimal.  *Jones W. Reserve Transit Auth.*, 455 F. App'x 640, 647 (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2012)).

After the parties completed briefing this case, the Supreme Court decided *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — S. Ct. —, 2013 WL 3155234 (Jun. 24, 2013), which clarified the causation standard applicable to retaliation claims that involve "mixed motives" by an employer. Based on its interpretation of Title VII's statutory text, the Supreme Court held that Title VII retaliation claims are governed by a different standard of causation than Title VII discrimination claims.  Specifically, whereas a plaintiff can prevail on a discrimination claim by showing that an unlawful motive was merely a "motivating factor" for the employer's adverse action against the employee, a Title VII retaliation claim requires the plaintiff to show that the employer's unlawful motive was a "but for" cause of the employer's adverse action.  *Id.* at *14.  In other words, to prove a retaliation claim, that plaintiff must prove that "the unlawful retaliation would not have

20

occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

The court construes *Nassar* as consistent with prior Sixth Circuit precedent, which requires the plaintiff to show that "the decision complained about as retaliatory would not have been made 'but for' the protected status of the plaintiff." *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064 (6th Cir. 1990). Harmonizing *Nassar* and the "honest belief" standard, it appears that Dunn must show that (1) if he had not complained about the company being a racist company, the defendants would not have terminated him – *i.e.*, that the defendants would not have terminated him for any other statements they honestly believed that he had made and that they honestly believed violated company policies; and (2) even if the company terminated him solely for stating that it was a racist company, the defendants did not have an honest belief that, taken in context, Dunn's comment was objectively offensive, racially insensitive towards Hopkins, and merited termination for reasons other than attempting to punish Dunn for "opposing" discrimination by AFC.[13]

Although it is a very close question, the court finds that there is a genuine dispute of material fact as to whether the defendants' actions were a pretext for retaliation. Whether the underlying comments constituted "opposing" activity rather than "denigration" of Hopkins (and African-Americans generally) is a matter of factual interpretation that, for the reasons explained in the previous section, the court cannot decide at summary judgment. If the jury adopts Dunn's

---

[13]The appropriate wording of a jury instruction concerning Dunn's retaliation claim could prove to be a disputed issue. At least one Sixth Circuit case suggests that, in crafting a jury instruction with respect to a Title VII claim involving the "honest belief" defense, a district court would not abuse its discretion in crafting an instruction that avoids jury confusion. *See McDole v. City of Saginaw*, 471 F. App'x 464, 476-77 (6th Cir. 2012) (jury instruction in Title VII race discrimination claim to which employer had asserted "honest belief" defense).

21

view of the facts and concludes that he engaged in protected activity, the defendants have essentially admitted that the fact that Dunn accused the company of institutional racism (*i.e.*, protected activity) was at least one factor in its decision to terminate Dunn. However, the interviewees also reported that Dunn made a number of other potentially derogatory and/or inappropriate statements, which, even in the absence of the "protected" statements, may have independently justified Dunn's termination under the Personal and Professional Conduct Policy. Thus, even assuming that Dunn can establish that he engaged in protected activity, the jury will need to determine whether he would have been terminated regardless of the allegedly protected activity.

In that regard, the defendants can argue (perhaps compellingly) that they honestly construed Dunn's comments as a whole, including the comments relating to racism at AFC, as objectively offensive and in violation of company policy. Except for Dunn, all of the witnesses – including Hopkins – reported to AFC at the time that Dunn had acted "inappropriately," made them "uncomfortable," lacked a "filter", and/or acted "out of line." Moreover, when interviewed, Dunn may have disavowed having criticized the company, admitted to the "Tiger Woods" statement but argued that it was not actually offensive, and generally pleaded for mercy by AFC, in part because everyone at the events had been drinking. On the other hand, (1) the defendants admit that Dunn's accusations against AFC were a factor in their decision to terminate him; and (2) it is unclear why Keadle weighed Dunn's alleged use of the "N" word, even though the record contains no indication (documentary or testimonial) that Dunn used that word.

Ultimately, notwithstanding the uphill climb that Dunn will face at trial, the court is loathe to conclude, based on the existing record, that the defendants lacked the requisite

discriminatory intent as a matter of law. Therefore, the court finds that there are genuine disputes of material fact that preclude summary judgment on Dunn's Title VII retaliation claim.

## IV. DETAILS REGARDING OTHER DISCRIMINATORY ACTS

The parties have submitted materials relating to two other sets of alleged discriminatory acts. The first set of materials concerns allegations of race discrimination by Toni Moore, a former black AFC Branch Manager whom Dunn deposed in this case. At her deposition, Moore testified that her manager, Frank King, made numerous racist comments to her, such as lamenting racial integration, stating that blacks should "remain in their place," and suggesting that all black people were on food stamps and dependent on government assistance. Moore testified that she reported the comments to Daidone and Keadle, but that Daidone and Keadle (and AFC generally) did nothing about them, culminating in Moore's voluntarily resignation from AFC. In this case, King has filed an affidavit denying Moore's allegations, and both Daidone and Keadle denied at the deposition that Moore ever complained to them about King's comments. The second set of materials concerns Dunn's allegation that his predecessor, Duane Loux, made racist statements in front of Dunn, including using the "N" word and accusing Dunn of "put[ting] Sambo in office" for voting for Barack Obama.

At least for purposes of summary judgment, Dunn has not established the relevance of either of these sets of allegations. As best the court can distill from Dunn's rambling Response, he appears to suggest that Moore's allegations are relevant to (1) whether Dunn reasonably believed that AFC is racist, (2) whether AFC is racist, and/or (3) whether AFC unfairly treated Dunn more harshly than King, who allegedly made racially charged statements worse than Dunn. The Response does not even purport to explain the relevance of allegations about Loux, who left

23

the company well before the incidents in question and had no apparent relationship to the facts at issue.

Having reviewed the record, the court is concerned that Dunn will seek to put on a "side trial" about issues of no relevance or at best tangential relevance to this case. Moreover, testimony concerning these issues could be highly prejudicial to the defendants and/or confuse the jury about the ultimate questions it must resolve. Given the court's concerns, the court has not relied on the Moore allegations or the references to Loux at this stage. To the extent that Dunn will seek to rely on either set of allegations at trial (whether for the truth of the matter asserted or for some other purpose), the admissibility of that information will be better addressed at the motion *in limine* stage, when the parties will have the opportunity to brief the issue(s).

## IV.   CONTRACT CLAIM

Dunn argues that the defendants are liable to pay him a performance bonus that he had accrued before his termination. This claim relates to the 2010 KAR Auction Services Annual Incentive Program, under which Dunn and other Branch Managers were eligible to receive a conditional performance bonus.

The Annual Incentive Program was designed to "reward eligible employees of the Company with incentive compensation based on their contributions toward meeting and exceeding overall Company goals." (Docket No. 38, Ex. 2. Barber Dep., Ex. 6 thereto (KAR Annual Incentive Program Summary of Terms, Program Year 2010).) The relevant "Performance Period" was defined as January 1, 2010 through December 31, 2010 (*i.e.*, the 2010 calendar year). Dunn was eligible to receive performance bonuses tied to various performance metrics set forth in a 2010 Annual Incentive Program Statement. (*See* Docket No. 11, Ex. 8.)

24

The incentive program terms provided that, "[g]enerally, all awards are paid out annually but certain positions, if approved by the Committee and business unit President, may be paid out quarterly or semi-annually." (Summary of Terms at p. 3.) The program also provides that "[a]wards will be paid as soon as practicable after the audited financial results are available for the performance period," and "[i]t is generally anticipated that payment will be made within ninety days after the performance period ends." (*Id.*) The program also contains provisions for "prorated awards," which state that, *inter alia*, where an employee is promoted, a prorated award may be earned based on the time spent in each position. Finally, the program states that, "[g]enerally, upon termination of employment for any reason, the individual will forfeit any award that has not been paid," and that, "[i]n the event that employment with the Company is terminated voluntarily by the individual or by the Company, the individual will forfeit any award that has not been paid, in accordance with the Program." (*Id.* at 4.) However, in the event of retirement, disability, or death, the company pays out prorated awards based on the number of months employed (within the Performance Period) prior to termination of employment for any of those reasons. (*Id.*)

Dunn originally received a copy of the 2010 Annual Incentive Program in a letter from AFC President and CEO Don Gottwald informing Dunn of his eligibility for the program. That letter expressly states that KAR "reserves the right to change or amend its compensation programs at any time for any reason. Your receipt of this statement *does not constitute a contract of employment*." (Docket No. 38, Ex. 3, Barber Dep., Ex. 6 to Barber Dep.) Mr. Dunn's individualized 2010 Annual Program Statements contained the same disclaimer.

Mr. Dunn was terminated on October 8, 2011. AFC paid out bonuses for the 2010

"performance period" on February 18, 2011.

Dunn argues that he is entitled to payment of a prorated bonus for 2010 under the Tennessee common law doctrine of "partial performance" of contracts. *See Blasingame v. Am. Materials, Inc.*, 654 S.W.2d 659, 663 (Tenn. 1983). Dunn's argument fails for multiple reasons.

First, Dunn has not even addressed the defendants' argument that the 2010 Annual Incentive Program did not constitute a contract in the first place. Both the cover letter that Dunn received and his individualized performance incentives statement included express disclaimers that the program did not establish a contractual relationship. Indeed, Dunn did not "sign on" to the program, nor was he required to compete for a bonus as a condition of continued employment. Thus, there was no contractual relationship, the doctrine of partial performance of a contract is inapplicable, and Dunn's breach of contract claim must fail.

Second, even assuming *arguendo* that there was a contractual agreement between Dunn and the defendants, Dunn has not addressed the defendants' argument that Tennessee courts consistently enforce conditions precedent to receiving a bonus, including a requirement that the qualifying employee be employed on the date bonuses are awarded. *See Underwood v. MacMillan/McGraw-Hill Sch. Publ'g Co.*, No. 03A01-9510-CV-00357, 1996 WL 31139, at *2 (Tenn. Ct. App. Jan. 29, 1996); *Weir v. Golden Cir. Ford*, No. 7, C86-336, C87-87-7, 1988 WL 25277, at *4 (Tenn. Ct. App. Mar. 21. 1998); *see also Weiss v. Lab. Corp of Am.*, *Holdings*, Nos. 3:06-0950, 3:06-1010, 2007 WL 4365763, at *12 (M.D. Tenn. Dec. 11, 2007) (applying Tennessee law). Here, Dunn was not employed on the date AFC distributed bonuses and, therefore, did not meet a condition precedent to receive a bonus. Although the policy did include qualifying language that bonuses are "generally" paid yearly (rather than, for example, quarterly),

26

Dunn has not shown that KAR's Compensation Committee and business unit President approved quarterly or semi annual payments with respect to Dunn specifically and/or Branch Managers generally. Similarly, although the policy included provisions for prorated awards, Dunn has not shown that any of the special conditions, such as retirement, disability, or death, applied to him.

With respect to the putative bonus payment, Dunn has not asserted any theory of liability other than his breach of contract theory. Because the breach of contract theory fails, the court will dismiss Dunn's breach of contract claim with prejudice.

## CONCLUSION

For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted in part and denied in part. Dunn's retaliation claims under Title VII and the THRA will remain for trial. Dunn's breach of contract claim will be dismissed with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge